UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KIMBER HUMMEL, as parent of C.H., an infant,

                  Plaintiff,

vs.

TARGET CORPORATION,

                  Defendant.

DECISION AND ORDER

19-CV-6852-EAW-MJP

---

**Pedersen, M.J.** Presently before the Court is a motion for sanctions filed by plaintiff Kimber Hummel, as parent of C.H., an infant ("Plaintiff") against defendant Target Corporation ("Target") pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37(b) or, in the alternative, Fed. R. Civ. P. 37(e) for allegedly spoliating security camera video evidence. (ECF No. 76.) The undersigned held oral argument on the motion on May 8, 2024. For the reasons discussed below, the Court DENIES Plaintiff's motion for sanctions.

## FACTUAL BACKGROUND

Plaintiff contends that on October 29, 2011, at approximately 5:30 p.m. at Target store #1475, her child, C.H., who was 9 months old at the time, sustained injuries to her head and brain when the shopping cart in which she was riding allegedly broke causing C.H. to fall into the cart.

Former Target senior team leader Cory J. Walts completed an incident report on the date of the incident. The incident report indicates that the location of the incident was "Check Lane 10." (Carey Dec. Ex. A, ECF No. 72-2.) Mr. Walts

1

testified that Check Lane 10 was located at the front of the store (*Id.* Ex. G 36:2–7, ECF No. 76-8.) He testified that he did not have access to the security camera room and that only employees of Target's Assets Protection Department had access to that room.[1] (*Id.* 129:13–16.) Mr. Walts further testified that after the accident he would have alerted Assets Protection that he was looking for video of the alleged incident. (*Id.* 79:18–80:1.)

Plaintiff conducted the deposition of former Target Assets Protection team leader Matthew Martin on June 29, 2022. (*Id.* Ex. H, ECF No. 76-9.) Mr. Martin testified that at the time of the incident he was the Assets Protection team leader in the Assets Protection Department for Target store 1475. (*Id.* 12:6–13:9; 23:2–24:9; 66:17–67:2.) Mr. Martin explained that as part of its security Target installed point/tilt/zoom ("PTZ") cameras that could be moved to view other angles or areas of the store by a joystick by an individual in the Assets Protection office. (*Id.* 47:3–48:15; 94:8–16.) The PTZ cameras could not move by themselves. (*Id.* 94:17–18.) Mr. Martin further testified that the PTZ cameras would stay in the same position until somebody in the Assets Protection office moved them. (*Id.* 54:10–18.) Mr. Martin testified that members of Assets Protection and any management that has a key is permitted to be in the Assets Protection office. (*Id.* 31:5–9.)

---

[1] During oral argument held on May 8, 2024, defense counsel represented that Mr. Walts did have access to the security camera room because he was a manager on duty and all key holders (meaning all managers, not just the manager on duty) had access to the Assets Protection office.

2

He testified that if a person wanted to watch video that had already been recorded by Target's security cameras that person would choose the camera that may have recorded the particular video in question on the multiplexor, then rewind the VHS tape on the VCR to the timeframe in question. (*Id.* 58:7–14.) He indicated that as part of his job he would provide video of the incident if there was any such video and as Assets Protection leader if he was the first person on site of an incident he would complete a guest incident report. (*Id.* 62:21–64:14.) Mr. Martin testified that he "was asked to provide the video evidence if we had any for the event that happened." (*Id.* 70:14–15.)

Mr. Martin could not recall if he was present at Target store 1475 when the incident took place and that there may not have been anybody in Assets Protection present at the store at that time. (*Id.* 70:18–20; 102:9–12.) When questioned what the process was for determining whether there was video of an incident, Mr. Martin testified: "I take [the] Incident Report, I get the date and times, and then I go back to my video and I rewind everything and rewatch every angle of the store in order to try to attempt to find any video of the incident or the individuals involved." (*Id.* 73:15–19.) He testified that the guest incident report indicated that the incident took place on October 29, 2011, at 5:30 p.m. in "Check Lane 10." (*Id.* 73:25–74:20.)

Mr. Martin testified that he created the videos contained on the five VHS tapes marked at his deposition in his role as Assets Protection team leader at the time of the incident. (*Id.* 78:3–24; 79:6–18.) Mr. Martin testified that he

3

"remember[ed] being able to review video and not finding evidence, video evidence of that area at that time" and that he "provided whatever video [he had] of either the incident or the individuals that were involved." (*Id.* 80:5-12; 81:17-19.) He further testified that he "would have put anything that was relevant to that incident onto this tape if it was there." (*Id.* 87:19-21.) Plaintiff's counsel pointed out that the VHS tape marked as Exhibit 4 switched from video of the front entrance to a "quite visible" view of Check Lane 10 at around 7:08 p.m., confirmed this with Mr. Martin, and further confirmed that the feed showing the front entrance was from a different camera (camera 1) than the feed in which one could see Check Lane 10. (*Id.* 88:9-24; 89:22-91:11; 112:16-19.) Mr. Martin indicated that he included feed from camera 1 on the VHS tape as he felt it was relevant "because it show[ed] [the Hummels] coming in and out of the building." (*Id.* 113:20-25.)

Mr. Martin testified that the camera showing Check Lane 10 was a PTZ camera that was moved "all the time" and that this particular camera, camera 2, "was not showing video of [Check Lane 10] at [5:30 p.m.] or it would have been provided." (*Id.* 91:12-92:9; 93:21-94:2.) He further testified that he did not provide what this camera was showing during the time of the incident because "it was irrelevant to the situation" and that he "provided everything that was asked of [him] at that time. And what [he] provided is exactly what [Target] had evidence or video of the individuals at the time." (*Id.* 92:10-13; 92:22-25.)

4

Mr. Martin also confirmed that at 8:37 p.m. on the date of the incident someone was in the Assets Protection office and moved camera 1 but further testified that "[i]t doesn't necessarily mean it's asset protection. Managers all had keys to get into the office and would go in there and try to get, they would go in there and use that to try to get faces of potential shoplifters if they could." (*Id.* 103:19–104:8.) Mr. Martin clarified that a Target employee had to be a "key carrying manager" to access the Assets Protection office and that "[t]here would be a key carrier in the store at all times." (*Id.* 104:10–17.) When Plaintiff's counsel asked if Mr. Martin made the decision to not include the video from camera 2 during the time of the incident, Mr. Martin replied

> I provided everything that was relevant to that case at that time. That's what I felt when I downloaded or shared that video. Now I also, it may have been on these other videotapes as well, but I don't know that answer. But as asset protection I provided anything relevant to that individual, to that case, to that situation. It's provided to our claims department. No matter what it is, good, bad or ugly.

(*Id.* 118:7–19.) Finally, Mr. Martin testified that if he had been able to see the Hummels at the time of the incident when reviewing the video he would have saved that video. (*Id.* 141:12–22.)

### *Plaintiff's Argument:*

Plaintiff contends that the Court should issue an order imposing sanctions for spoliation on Target pursuant to Fed. R. Civ. P. 37(b) "because it failed to preserve evidence that it controlled that is relevant to Plaintiff's claim, for which

5

it had an obligation to preserve, while doing so with a culpable state of mind."[2] (Carey Dec. ¶ 17, ECF No. 76-1.) In the alternative, Plaintiff asserts that sanctions for spoliation are warranted under Fed. R. Civ. P. 37(e) because Defendant

> failed to take reasonable steps to preserve unedited video surveillance footage on VHS tapes "that should have been preserved in the anticipation or conduct of litigation" and that the lost unedited video surveillance footage on VHS tapes cannot be restored or replaced through additional discovery, resulting in prejudice to Plaintiff, and that Defendant Target Corporation acted with the intent or negligence to deprive Plaintiff of the unedited video footage for use in this litigation.

(*Id.* ¶ 28, ECF No. 76-1.)

The thrust of Plaintiff's argument can be gleaned from the following: "[i]f no one from asset protection was there on the evening of October 29, 2011, then the view from the PTZ cameras, including most notably from Camera 2, were set and would remain set on what they were recording until somebody showed up to potentially move them on October 30, 2011." (*Id.* ¶ 12, p. 15, ECF No. 76-1.) Plaintiff concludes, therefore, that

> the testimonial and documentary evidence . . ., taken individually and collectively, and all reasonable inferences drawn from the testimony establish that because the video footage from Camera 2 at 7:08 p.m. on October 29, 2011, was focused on Check Lane 10, exactly where the subject incident occurred, and it was a PTZ camera, it should have also been focused on Check Lane 10 between 5:00 p.m. and 06:00 [sic] p.m., unless someone manually changed what it was pointed at. The testimony establishes that the only people within Target who could change where Camera 2 was looking at were asset protection personnel or a manager with a key. Corey John Walts' testimony conclusively establishes that he did not have a key to get into the asset protection

---

[2] Plaintiff asserts that Fed. R. Civ. P. 37(b) is applicable here because "VHS tapes . . . are tangible evidence, rather than 'electronically stored information', and because Fed. R. Civ. P. Rule 37(b) and case law interpreting it were the law in effect at the time Defendant Target Corporation spoliated the evidence at issue." (*Id.* ¶ 19, ECF No. 76-1.)

6

video room to change what the video was looking at. Matt Martin's testimony conclusively establishes that he was not at the store at the time the subject incident occurred, because if he was on site, he would have conducted interviews and initiated the Guest Incident Report, and he was not the one that initiated that report. Lastly, and significantly, the electronic incident report, recorded on October 29, 2011 at 8:51 p.m., indicates that it was unknown whether there was video footage, and the only reason why it was unknown was because no one from asset protection was at the store to review the video.

(*Id.* ¶ 26, ECF No. 76-1.)

Plaintiff seeks the following sanctions pursuant to Fed. R. Civ. P. 37(b) and/or 37(e):

> (1) preclude Defendant, Target Corporation, from arguing that Plaintiff sustained a "minor bump" to the head in the incident, or from introducing evidence or argument to the jury that the subject incident and/or that the impacts on the infant Plaintiffs 9-month-old head, brain and face were not sufficient to cause a concussion or traumatic brain injury, (2) permitting Plaintiff to present evidence and argument to the jury regarding the loss of the video footage, and/or (3) giving the jury instructions to assist in its evaluation of such evidence or argument and to allow the jury to infer that the video spoliated would not have been helpful to Defendant and would likely have favored the Plaintiff's claims.

(Pl.'s Mem. of Law at 25, ECF No. 76-13.)

***Target's Argument:***

Target contends that Plaintiff failed to meet her burden of demonstrating by a preponderance of evidence that it spoliated the video from camera 2 during the time of the incident. (Briandi Dec. ¶ 12, ECF No. 85.) Target asserts that (1) it preserved all relevant evidence of the incident and provided it to Plaintiff; (2) evidence of the incident never existed; and (3) "Plaintiffs have produced no evidence that Target purposefully destroyed or failed to preserve any evidence nor

7

that had such evidence existed, it would have supported (to Target's detriment) one of Plaintiffs' claims in this lawsuit." (*Id.* ¶ 15, ECF No. 85.)

Target contends that Plaintiff's motion is based upon speculation in several respects, including that (1) because camera 2 was pointed at checkout lane 10 after 7:00 p.m. on the date of the incident, it must have been pointed in that direction during the incident; (2) Mr. Martin purposely omitted the video of the incident when creating the VHS tapes; and (3) that Mr. Martin lied at his deposition when he said he did not record the video that was on camera 2 prior to approximately 7:00 p.m. because it was not relevant. (*Id.* ¶ 16.) Target also asserts that Mr. Martin provided testimony explaining that even though he might not have been present in the store around the time of the incident someone with the ability to move the PTZ cameras was in the store as demonstrated by the fact that camera 1 footage provided to Plaintiff shows the view being adjusted on that camera in real time around the time of the Hummel's visit to Target. (*Id.* ¶ 35, ECF No. 85.)

## ANALYSIS

"The Second Circuit defines spoliation as 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Taylor v. City of New York*, 293 F.R.D. 601, 609 (S.D.N.Y. 2013) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "A party seeking sanctions for spoliation of evidence must establish the following three elements: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was

destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim . . . such that a reasonable trier of fact could find that it would support that claim.'" *Id.* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Moreover, "[a]s a threshold matter, 'a party seeking spoliation sanctions must necessarily show that the evidence at issue actually existed,' since 'spoliation sanctions can be imposed only when the party seeking such sanctions demonstrates that relevant evidence has been lost.'" *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175–76 (S.D.N.Y. 2022) (quoting *La Belle v. Barclays Capital Inc.*, 340 F.R.D. 74, 82 (S.D.N.Y.)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 493 (S.D.N.Y. 2022); *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (collecting cases).

Here, the Court agrees with Target that Plaintiff has failed to meet the threshold issue of demonstrating that video footage from camera 2 on the date and time of the incident ever existed in the first instance.[3] Plaintiff has offered only speculation to support its assertions that Target spoliated evidence. For example,

---

[3] The Court does not, however, agree, that the language contained in its decision and order granting Target's motion for a protective order related to its third-party claims administrator, Sedgwick Claims Management Services ("Sedgwick") (ECF No. 65), constitutes the law of the case that should control the Court's decision here. The issue before the Court in the prior motion was whether Target was entitled to a protective order precluding disclosure of the Sedgwick claims file to Plaintiff on the basis that it was prepared in anticipation of litigation. While Plaintiff indicated that it sought the Sedgwick claims file, in part, to support its theory that Target allegedly spoliated footage from camera 2 at the time of the incident, this issue was not squarely before the Court and was not fully litigated until now.

9

Plaintiff contends that camera 2 must have been pointed in the direction of Check Lane 10 at the time of the incident because Plaintiff received footage that camera 2 was pointed at Check Lane 10 at around 7:08 p.m. on that date and there was no one in the store around the time of the incident that was authorized to move the PTZ cameras. However, Mr. Martin testified that not only could members of the Assets Protection Department move the PTZ cameras, but also "key carrying managers" had access to the Assets Protection office and could move the cameras. In addition, camera footage provided by Target to Plaintiff shows camera 1, a PTZ camera, moving in real time at or around the time of the incident, which means someone in the store had access to the Assets Protection office and had the ability to move the PTZ cameras.

Further, Mr. Martin repeatedly testified under oath that he provided all relevant evidence on the VHS tapes. He further testified that he did not include footage from camera 2 prior to approximately 7:00 p.m. on the date of the incident because it was not relevant as it was pointed in another direction at that time, though he does not recall where. In sum, Plaintiff has not demonstrated that any evidence existed in the first place that was later destroyed.

### *Attorneys' fees.*

Rule 37(a)(5)(B) provides that where a motion to compel is denied,

> the court . . . must, after giving the opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

Given that the Court is denying Plaintiff's motion, it directs Target to submit an application for reasonable expenses, including attorneys' fees, incurred in opposing the present motion.

## CONCLUSION

For the reasons discussed above, the Court DENIES Plaintiff's motion for sanctions (ECF No. 76).

**IT IS SO ORDERED.**

DATED:   June 7, 2024
         Rochester, New York

*[signature]*
MARK W. PEDERSEN
United States Magistrate Judge